UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

PATRICIA S. MATHIAS,         )
         )
    Plaintiff,         )
         )
   v.         )     CIVIL NO. 1:18cv260
         )
NANCY A. BERRYHILL, Acting   )
Commissioner of Social Security,   )
         )
    Defendant.         )

## OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's application for Disability Insurance Benefits (DIB), as provided for in the Social Security Act. Section 205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. §405(g).

The law provides that an applicant for DIB must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of no less than 12 months. . . ." 42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A). A physical or mental impairment is "an

impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2.    The claimant has not engaged in substantial gainful activity since September 12, 2014, the alleged onset date (20 CFR 404.1571 *et seq*.).

3.    The claimant has the following severe impairments: fibromyalgia; chronic pain syndrome; lumbar spondylosis; spondylosis and degenerative disc disease in the cervical spine; cervical radiculopathy; status-post right C5-6 laminotomy and foraminotomy for decompression of the nerve root; right shoulder impingement syndrome; subacromial bursitis and SLAP tear; chrondromalacia of both patellae; obesity; major depressive disorder; and anxiety disorder (20 CFR 404.1529(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except no overhead reaching bilaterally. She is limited to frequent handling, fingering and feeling bilaterally. She is limited to occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling. She cannot climb ladders, ropes or scaffolds. She must avoid unprotected heights, moving mechanical parts and operating a motor vehicle. She can tolerate occasional exposure to extreme cold and heat, and humidity. She can tolerate exposure to moderate noise in the work environment. She is limited to performing simple, routine and repetitive tasks but not at a production-rate pace (e.g. assembly-line work). She is limited to simple work-related decisions. She is limited to occasional interaction with supervisors and coworkers. She cannot interact with the public but can be in proximity with the public. She is limited to tolerating occasional changes in a routine work setting.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on May 17, 1969 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 12, 2014, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 13-22 ).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed her opening brief on December 20, 2018. On February 7, 2019 the defendant filed a memorandum in support of the Commissioner's decision to which Plaintiff replied on March 11, 2019. Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162

n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that Step 5 was the determinative inquiry.

Plaintiff was born on May 17, 1969, and was considered a "younger person" as of the date she alleged her disability began. (Tr. 220). She has a bachelor's degree in accounting. (Tr. 160, 337). Ms. Ringenberg classified Plaintiff's past work as that of a paralegal, gas station cashier, press operator, and automobile assembler. (Tr. 195).

Plaintiff testified that she had not worked or applied for work since September 12, 2014. (Tr. 160-161). She reported that earnings from TI Group received in the first quarter of 2015 were for short-term disability. (Tr. 160-161).

On March 2015, state agency medical consultant, J.V. Corcoran, M.D. reviewed Plaintiff's claim at the initial level of review and projected a residual functional capacity for a limited range of light work with environmental, postural and manipulative limitations as of December 2015, which is 12 months after Plaintiff underwent surgery on her right shoulder. (Tr. 225- 229, 518-519). In April 2015, state agency psychological consultant, Kari Kennedy, Psy.D. reviewed Plaintiff's claim regarding her psychological impairments and concluded that her mental impairments were not severe and resulted in mild restriction of activities of daily living, social functioning, and in maintaining concentration, persistence or pace. (Tr. 223-224). Upon reconsideration, in July 2015, another state agency medical consultant, M. Brill, M.D., affirmed without change the prior projected residual functional capacity assessment. (Tr. 238-240). Another state agency psychological consultant, Joelle Larsen, Ph.D. affirmed without change the assessment and finding of Dr. Kennedy who indicated that the Plaintiff's mental impairments were not severe.

On April 6, 2015, Plaintiff presented to Candace Martin, Psy.D. for a consultative psychological evaluation at the request of the Indiana DDB. (Tr. 596-600). At the exam, Plaintiff reported that she was filing for disability due to her physical complaints, though Dr. Martin noted that Plaintiff had an extensive mental health history and reported being molested by her father, raped by a boyfriend, and a history of inpatient treatment for an eating disorder and outpatient mental health treatment. (Tr. 596). Plaintiff reported that she had worked as a paralegal from 1997 to 2009 but quit that job because of the stress. (Tr. 597). She also reported working in a factory for three years. (*Id.*). Dr. Martin noted that Plaintiff seemed quite lethargic and uninterested in interacting in an appropriately social manner. She was slow to respond to questions, and her attention and concentration seemed marginal. (Tr. 597-598). Her mood seemed discouraged and apathetic. (Tr. 598).

Dr. Martin concluded that Plaintiff evidenced signs of depression in the form of disturbance in sleep, appetite, anhedonia, and lethargy. Her weakness in cognitive functioning seemed to be evidence of her depression and social withdrawal rather than intellectual deficit. (Tr. 599). Dr. Martin diagnosed Plaintiff with major depressive disorder. (*Id.*).

Records before the state agency included an October 2012 psychiatric evaluation from the Bowen Center. Plaintiff's diagnoses included major depressive disorder, recurrent, and "rule-out" diagnoses of post-traumatic stress disorder and eating disorder. (Tr. 429-434). At a follow-up appointment in November she was instructed to continue Celexa and to start therapy.

Parkview Health Physician Group records reflect that Plaintiff presented to the office of Phillip Corbin, M.D. in 2014 regarding anxiety and depression. (Tr. 436-443). On August 25, 2014, she presented to her doctor's office with excessive worry, irritability, muscle tension and

6

nervous/anxious behavior and was diagnosed with anxiety and given a prescription for Ativan and Prozac (Tr. 436-437). She felt a great deal of her tension and muscle pain was related to stress and anxiety. (Tr. 436). She was placed on leave from work through August 29, 2014. (Tr. 438). At a follow-up appointment in September 2014, Plaintiff reported that her anxiety and stress were slowly improving with medication. (Tr. 440).

On September 17, 2014, Plaintiff presented to Dr. Corbin's office regarding neck and shoulder numbness radiating down her right arm after presenting to the emergency room with arm pain on September 12, 2014. (Tr. 444, 462-466). She was tearful, anxious, worried about her job, and in obvious discomfort. (*Id*.). An examination showed decreased right grip strength with weakness and strength reduced to 3/5 in the right upper extremity. (Tr. 445). She was instructed to take Tylenol #3 for severe pain and placed on leave from work. (Tr. 446). A September 2014 MRI of the cervical spine showed small disc protrusions at C5-6 and C6-7. (Tr. 447). Dr. Corbin diagnosed shoulder strain and paresthesia secondary to nerve irritation and recommended prednisone, a muscle relaxer, and therapy. (Tr. 451). Plaintiff returned in October and reported that she was experiencing no significant improvement of her symptoms with therapy and medication. (Tr. 454). She was instructed to remain off work. (Tr. 455).

A right shoulder MRI from November 2014 showed mild cystic degeneration of the humeral head and fraying or rounding of the anterior labrum. (Tr. 469). Jason Hanna, M.D. with Fort Wayne Orthopaedics diagnosed right shoulder impingement syndrome and possible bicep tendinopathy. (Tr. 548-549). On December 24, 2014, Plaintiff underwent a right shoulder subacromial decompression and debridement. (Tr. 518-519). Following surgery she participated in occupational therapy with a goal of returning to work. (Tr. 493).

In February 2015, Plaintiff presented as a new patient to Kevin Rahn, M.D. at Fort Wayne Orthopaedics and reported numbness and tingling in the arms and hands. (Tr. 544). Dr. Rahn noted that a MRI of the cervical spine from September 2014 showed a C5-6 disc bulge and C6-7 stenosis. (*Id*.). Dr. Rahn also noted that an EMG from Dr. Mark Zolman in December 2014 showed radiculopathy of C6. (Tr. 487, 544).

In March 2015, Plaintiff presented to Dr. Corbin and reported that she was doing worse and had fallen on ice. (Tr. 528). In March 2015, Plaintiff also presented for a consultation with T.J. Curfman, M.D., and his impression was carpal tunnel, weakness, and depression. (Tr. 587-589). Dr. Curfman noted in April 2015 that an EMG/nerve conduction study was normal, and he recommended increased Gabapentin use. (Tr. 584)

Records available at the reconsideration level of review included an April 2015 examination from Dr. Corbin who noted multiple joint and muscle aches consistent with possible fibromyalgia. (Tr. 602-603). Dr. Corbin referred Plaintiff for a rheumatology consultation. (*Id.*) Parkview Physician Group Rheumatology records were also available upon reconsideration and included a May 2015 visit with Hirenkumar Patel, M.D. (Tr. 610-613). Dr. Patel's examination showed generalized tenderness and multiple fibromyalgia tender points throughout the body. (Tr. 612). Dr. Patel assessed fibromyalgia pain, likely worsened by severe anxiety, and he recommended Cymbalta and low impact aerobic exercise. (Tr. 613).

The evidence discussed below was first available at the ALJ hearing level. Consequently, state agency medical consultants and psychological consultants did not review the evidence. In July 2015, Plaintiff presented for a psychiatric evaluation with Jean Merkler, LMHC and Herbert Trier, M.D. Her diagnoses included major depressive disorder, recurrent, severe; anxiety disorder;

and eating disorder and PTSD. (Tr. 639-642). A GAF score of 531 was assigned with a recommendation to continue on psychotropic medications and individual therapy. (Tr. 642).

Michael Scherbinski, Ph.D., HSPP, completed a summary progress note in March 2017 and reported that he had treated Plaintiff with cognitive behavioral therapy (CBT). (Tr. 958). Her initial session was on March 17, 2016, and her most recent session was on December 28, 2016. (*Id.*). Dr. Scherbinksi completed a mental impairment questionnaire in March 2017 and indicated that Plaintiff's diagnoses were generalized anxiety disorder and major depressive disorder. (Ex. 952). He estimated that she would be absent from work more than three days per month and would be on task less than 70% of the workday. (Tr. 954-955). Dr. Scherbinki also detailed findings in support of his conclusion. (*Id.*).

Medical evidence from Dr. Corbin reflects that he continued to prescribe medications for Plaintiff's depression and anxiety. (Tr. 774-811). In August 2015, he added Seroquel and noted Plaintiff's anxiety and depression were poorly controlled. (Tr. 780). In February 2016, Plaintiff reported to Dr. Corbin that she was having difficulty getting motivated to get out of bed and avoided leaving the home. (Tr. 799). She got anxious around other people and felt down and flat. (Tr. 799-800). In May 2016, Plaintiff reported that her chronic pain, anxiety, and depression were not well-controlled. She was having increased depressive symptoms with crying spells, mood swings, irritability, and difficulty sleeping; she noted a significant increase in her pain levels which she felt may be triggering her depression. (Tr. 809). Dr. Corbin increased the dosage of Seroquel. (Tr. 810).

Dr. Corbin also evaluated Plaintiff physical impairments and referred her to specialists for evaluations and treatment. (Tr. 774-813, 1050-1052). In February 2017, Dr. Corbin reviewed

medical records and completed a Medical Source Statement regarding Plaintiff's impairments. (Tr. 946-949).

In January 2016, Plaintiff presented as a new patient to the Laser Spine Institute for evaluation and surgical consultation regarding her neck pain. (Tr. 990-999). She reported that the pain was progressively worsening and radiated into the shoulders, upper extremities, and into the hands with numbness, tingling, burning, weakness, and frequent headaches (Tr. 990). An x-ray and MRI of the cervical spine were completed on January 5, 2016. The x-ray showed neural foraminal narrowing at C5-6 and C6-7, and the MRI showed bulging discs at C5-6 and C6-7 with foraminal stenosis at C5-6. (Tr. 986). Thomas Francavilla, M.D reviewed the imaging and recommended surgery, a foraminotomy and decompression of the nerve root C5-6 on the right, based on the findings from the imaging and symptoms. (Tr. 987). Dr. Francavilla noted that Plaintiff had a combination of fibromyalgia and radiculopathy and that it was difficult to ascertain how much of her pain was from which process. (Tr. 987-988). On January 7, 2016, Dr. Francavilla performed surgery on Plaintiff's cervical spine, a right C5-C6 laminectomy and foraminotomy for decompression of the nerve root. (Tr. 960).

In March 2016, Plaintiff reported to her doctor's office that she had fallen two weeks after her surgery and again 12 weeks after the surgery. (Tr. 976). She also reported that she was experiencing pain to the back of the neck, to the right shoulder, and under the shoulder blade with left hand weakness and shaking. (Tr. 976). In May 2016, Plaintiff reported that she had further falls and was planning to see a neurologist. (Tr. 970). In June 2016 she reported that she had seen a neurologist who thought pinched nerves were causing falls and dizziness. (Tr. 967, 970).

An MRI of the lumbar spine was completed on December 1, 2016 and showed multilevel

facet arthropathy with central disc protrusion at T12-L1 with annular fissure without canal or foraminal stenosis. (Tr. 1044-1045). X-rays of the knees were completed in May 2016 and showed minimal medial compartment narrowing of the left knee. (Tr. 735-736).

Plaintiff received pain management treatment from Summit Pain Management between July 2015 and March 2016 for neck, arm and back pain. (Tr. 669-720). Despite being "needle phobic," Plaintiff elected to undergo a cervical epidural steroid injection in December 2015 after being recalcitrant to conservative interventions such as NSAID use and steroid tapers. (Tr. 685, 695). In March 2016 she reported that she fell three times and noted that she loses her balance all the time. (Tr. 672). She reported that she had a neck surgery in January and that it went well initially with no pain but the pain was returning. (*Id.*). On March 2016, Plaintiff called to "self-discharge" from Summit Pain because reportedly the provider did not listen to her when she reported new problems and would "send her out the door." (Tr. 671).

In May and June 2016, Plaintiff presented to Mark Zolman, M.D. with Physical Medicine Consultants at the request of Dr. Corbin. (Tr. 662-666). Dr. Zolman's exam showed severely limited extension of the lumbar spine and strength reduced to 4/5 in the lower and upper extremities. (Tr. 663, 665-666). There was tenderness along the sacrum, SI joints, cervical paraspinals, trapezius muscles, around the shoulders and elbows and knees. (Tr. 665-666). Dr. Zolman assessed primary fibromyalgia syndrome and cervical radiculopathy and recommended imaging of the knees and lumbar spine and continuing Cymbalta and Neurotin. (Tr. 664).

Plaintiff received pain management treatment from Parkview Pain Management between August and December 2016. (Tr. 843-944). In November 2016, examination showed positive straight leg raise test in the sitting and supine positions positive for radicular pain on the right

greater than the left (Tr. 911-912). She had tenderness and muscle spasms to the bilateral paraspinal muscles, difficulty standing from a seated position with frequent position changes in the chair due to discomfort and difficulty getting onto the exam table due to pain lifting her legs. (*Id.*). She had decreased range of motion with arms above the head, bilateral hand grip weakness, and right lower extremity weakness. (Tr. 912). Gait was antalgic and a cane and lumbar MRI were ordered. (*Id.*). At a December 2016 appointment, examination indicated positive straight leg raise test in the sitting and supine position. (Tr. 932). Results from a December 2016 lumbar MRI spine were positive for a multilevel facet arthropathy with central protrusion at T12-L1 with annular fissure without canal or foraminal stenosis. (Tr. 932-933). Her diagnoses included chronic pain syndrome, lumbosacral radiculopathy, and lumbar facet arthropathy. (Tr. 933).

Plaintiff was seen at Fort Wayne Orthopaedics for evaluation of bilateral knee pain in August 2016. (Tr. 829-832) X-rays were obtained and she was diagnosed with chrondromalacia of both patellae and provided with home exercise program. (Tr. 830-835).

In June 2017, Plaintiff had consultation with Jason Voorhies, M.D. with Parkview Physician Group Neurosurgery. He diagnosed chronic bilateral low back pain without sciatica, intermittent tremor, fibromyalgia, frequent falls, and balance problems. (Tr. 1054-1055). Dr. Voorhies referred Plaintiff to the Fall Prevention Clinic. (Tr. 1056). In July 2017 Plaintiff presented to the Parkview Hospital Center on Aging. (Tr. 1058-1062). She was instructed to use a cane or two canes when tired, hurting, or not confident, and to gaze straight forward when walking. (Tr. 1062).

Plaintiff testified at the ALJ hearing on March 15, 2017, and reported that the conditions that kept her from working included arthritis and bulging discs in her back that affected her gait,

carpal tunnel in her hands, fibromyalgia, and her mental status. (Tr. 164-165, 167). She also indicated that she had arthritis in her knees, a history of neck surgery, two right shoulder surgeries, and anxiety and depression that sometimes kept her in bed for two days straight. (*Id.*).

Plaintiff testified that she had constant pain in her back and in the lower lumbar area that went into her legs and buttocks. (Tr. 165). She reported that lying down in bed to stretch and decompress her back helped as did using a heating pad and massager. (Tr. 166). Pain medication, hydrocodone, was also helpful. She rated her pain as a nine without medication and a six with medication. (Tr. 166-167). She reported that her hands got tingly and numb and that she could hold her phone or tablet for about twenty minutes before her hands would start to hurt. (Tr. 167). She indicated that she would drop things a lot and had trouble with small buttons but could manage bigger buttons. (Tr. 167-168). Her range of motion was limited in the right shoulder after undergoing two surgeries; she could not lift her arms above her neck level; and she estimated that she had pain in the shoulder about 50% of the time. (Tr. 169-170). She experienced pain and stiffness in her neck that was worse with twisting. (Tr. 171). The pain had progressively gotten worse since September 2014. (Tr. 172).

Plaintiff underwent neck surgery in January 2016 and reported that she fell about a month after the surgery which "screwed it up." (Tr. 172). She had started to use a cane about six months ago. (Tr. 173). She reported that she needed the cane for walking and needed to hold onto something when standing. (Tr. 173-174).

Plaintiff reported that the fibromyalgia affected her memory and that she had panic attacks. She did not go outside much and at times had to leave church because she could not handle the noises and people talking. (Tr. 175). She reported that the panic attacks were triggered

by a lot of new people, different situations, and change. (Tr. 176). She could not pay attention to a 30 minute television show. (Tr. 177). She took Seroquel every night and Ativan as needed for her depression and anxiety. (*Id.*). She estimated that during a typical week she would stay in bed most of the day, sleeping for 12 or 13 hours, getting up to let the dogs out, and then going back to bed. (Tr. 178). She had been in therapy off and on for about ten years and had a history of inpatient hospitalization for her mental health issues and anorexia. (*Id.*).

Plaintiff estimated that she could lift five pounds; sit at one time for fifteen to twenty minutes; and stand about 20 minutes. (Tr. 179-180). She estimated that she could walk a half a block. (Tr. 180). She could perform certain household chores, such as laundry and vacuuming, with breaks. (Tr. 181, 185-186).

Plaintiff's husband, Michael Mathias, testified that since September 2014 he had been doing most of the housework, grocery shopping, and cooking. (Tr. 189). He noted that Plaintiff needed reminders to do things, her mind wandered, and she had trouble keeping track of appointments and her medications. (Tr. 190). During panic attacks, which he estimated occurred two to three times a week, she would "close down." (Tr. 191). She had also mood swings and would go from "happy go lucky" to sad and depressed about once or twice a week. (Tr. 192).

In support of remand, Plaintiff first argues that the ALJ failed to properly weigh the medical opinion evidence and incorporate all of Plaintiff's limitations in the RFC. A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and is not inconsistent with other substantial evidence in the record. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *see also* 20 C.F.R. §404.1527. The ALJ must always explain and give good reasons for the weight given the

opinion of the treating source, and he must not substitute his own judgment for the physician's opinion without relying on other medical evidence or authority in the record. *Clifford*, 227 F.3d at 870; *see also* C.F.R. § 404.1527.

In the present case, Plaintiff's long-time treating physician, Dr. Corbin, provided medical opinions in February 2017 regarding Plaintiff' impairments and limitations. (Tr.946-949). Dr. Corbin estimated that Plaintiff could walk one-half block without rest or severe pain, sit for about two hours, and stand/walk less than two hours in an eight-hour workday. (Tr. 947). He estimated that she could lift ten pounds rarely and less than ten pounds occasionally. (Tr. 947- 948). Dr. Corbin also indicated that Plaintiff would likely be "off task" 25% or more of a workday and would require unscheduled breaks about every thirty minutes with resting an average of 15-20 minutes. He thought she would be incapable of "low stress work" and would have good days and bad days with fluctuation in her stress and pain level that would likely result in absences of four or more days per month. (Tr. 948-949).

The ALJ gave "little weight" to Dr. Corbin's medical opinions because they allegedly were "not corroborated by the overall evidence including [Plaintiff's] lack of symptoms upon examination as well as diagnostic findings in the record." The ALJ provided a string of citations to selected exhibits without explaining how the evidence failed to corroborate the limitations. Plaintiff argues that not only has the ALJ failed to explain how the evidence fails to support Dr. Corbin's opinions, but the characterization of the record as lacking in evidence of symptoms and diagnostic findings reflects impermissible cherry-picking and substitution by the ALJ of his own lay opinion concerning the significance of medical findings for that of a treating source medical expert. *Meuser v. Colvin*, 838 F.3d 905, 911 (7th Cir. 2016). ("Thus, the ALJ improperly played

doctor when he ignored expert opinions to arrive at his own, incorrect, interpretation of the medical evidence.").

Plaintiff argues that, contrary to the ALJ's conclusion, there is significant medical evidence supporting Dr. Corbin's conclusions and most of that evidence was not considered by a medical professional other than Dr. Corbin. Plaintiff' cervical spine symptoms and updated imaging subsequent to the state agency medical consultant review were significant enough that she underwent surgery on the cervical spine in January 2016, right C5-C6 laminectomy and foraminotomy for decompression of the nerve root. (Tr. 960). Plaintiff's pain was also severe enough that she initiated pain management treatment beginning in July 2015 and continued in pain management. (Tr. 627-637, 661-720, 843-944, 1046-1048). As part of the pain management treatment, she not only took strong narcotic pain medications but also underwent injections despite begin "needle phobic." (Tr. 685, 695, 857-858).

Plaintiff points out that examination findings within the pain management records also corroborate Dr. Corbin's opinions and include, *e.g.*, severely limited extension of the lumbar spine and strength reduced to 4/5 in the lower and upper extremities (Tr. 663, 665-666); tenderness along the sacrum, SI joints, cervical paraspinals, trapezius muscles, shoulders, and in the elbows and knees (Tr. 665-666); antalgic gait with positive straight leg raise test in the sitting and supine positions reflecting radicular pain on the right greater than the left (Tr. 911-912); tenderness and muscle spasms to the bilateral paraspinal muscles (Tr.912, 932); difficulty standing from a seated position and frequent position changes in the chair due to discomfort (*Id*.); difficulty getting onto the exam table due to pain lifting her legs (*Id*.); and decreased range of motion with arms above the head, bilateral hand grip weakness (*Id*.); right lower extremity

weakness (*Id*.). An evaluation by Shelli Winther, N.P in November 2016 and an evaluation at Parkview Center on Aging and Health in July 2017 indicate a recommendation for use of an assistive device(s) due to falling. (Tr. 912, 1058-1060).

Mentally, Plaintiff was also evaluated by a psychiatrist, participated in cognitive behavioral therapy sessions, and required multiple medications to treat her anxiety and depression subsequent to the state agency medical consultants' review. (Tr.637-642, 774-813,952-956, 958).

Although the state agency opinions differed from Dr. Corbin's opinions, the opinions from non-examining state agency physicians do not by themselves suffice as substantial evidence to reject an examining physician opinion. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Moreover, in this case, the state agency medical consultant opinions were projected as of December 2015 based on a faulty assumption that Plaintiff's condition would improve. Dr. Corbin's opinions rendered in 2017 were based on the current evidence confirming that Plaintiff did not experience an improvement in her functioning but instead deteriorated.

Plaintiff notes that, even if there were "inconsistencies" weighing against Dr. Corbin's opinions, the ALJ was required to consider the factors set forth in 20 C.F.R. § 404.1527(c) in determining the weight to be given to the opinions: the length, nature and extent of the treatment relationship, the supportability of the opinion by medical evidence, the consistency of the opinion with the record as a whole, and whether the medical source is a specialist. *Scrogham v. Colvin*, 765 F.3d 685, 697 (7th Cir. 2014).

Although the ALJ acknowledged that Dr. Corbin was a long-time treating physician, it is not apparent what if any weight he gave to that factor. Plaintiff was a patient of Dr. Corbin since 2002 and has regularly treated Plaintiff for both her physical and mental impairments. (Tr. 946).

Because Dr. Corbin evaluated and treated Plaintiff's physical impairments and mental impairments, he was uniquely suited to account for the combined effect of these impairments. In assessing how often Plaintiff would be "off task" and her ability to handle stress, Dr. Corbin noted that she would have difficulty due to both chronic pain and anxiety. (Tr. 948).

Dr. Corbin's opinions were also rendered after review of medical records from multiple other providers and not just his own records. (Tr. 946). His opinions are also supported by reference to clinical findings and imaging results including x-rays and MRI results of the shoulder, cervical spine, lumbar spine, and knees. (Tr. 946). In addition, the mental limitations determined by Dr. Corbin are also generally consistent with the opinions of Plaintiff's treating psychologist, Dr. Scherbinski, concerning absences and "off task" behavior. (Tr. 948- 949, 954-955).

Dr. Corbin supplied the only medical opinion concerning Plaintiff's work-related abilities that take into the account the updated medical evidence and imaging, including the cervical spine MRI and x-rays from January 2016, lumbar spine MRI from December 2016, and x-rays of the knees from May and August 2016.  Plaintiff thus concludes that, in light of the significant new evidence, the ALJ erred rejecting the opinions of Dr. Corbin and instead relying on an outdated, projected residual functional capacity assessment by non-examining physicians. *Stage v. Colvin* 812 F. 3d 1121, 1125, citing *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir.2014) (remanding where ALJ uncritically accepted vague non-examining physician's report and failed to submit new MRI to medical scrutiny, which "she should have done since it was new and potentially decisive medical evidence").

Plaintiff contends that the ALJ's analysis is not sufficient to satisfy the Commissioner's

own rules regarding treating source evidence. It falls short of building the "logical bridge" required by the Seventh Circuit. *Schmidt v. Barnhart*, 395 F .3d 737, 744 (7th Cir. 2005). Instead of affording Dr. Corbin's opinion controlling or great weight, the ALJ engaged in a selective review of the evidence and impermissibly substituted his own lay opinion for that of a treating source medical expert.

Plaintiff argues that had the ALJ incorporated the limitations from Dr. Corbin in his residual functional capacity assessment, a finding of disability would result at step five of the sequential evaluation because Dr. Corbin's opinion reflects that Plaintiff does not have the residual functional capacity to perform work eight-hours a day, five days a week on a regular and continuing basis. (Tr. 947- 949). *See* Social Security Ruling 96-8p; see also POMS DI 24610.057 ("Inability to sustain a 40-hour workweek is an RFC finding….An inability to sustain a 40-hour work week at step 5 would result in a significantly eroded occupational base at all exertional levels.").

Plaintiff also argues that the ALJ improperly weighed Dr. Scherbinski's opinion. On March 23, 2017, Dr. Scherbinski provided medical opinions regarding Plaintiff's mental impairments, symptoms, and functioning. (Tr. 952-956). He indicated that she had generalized anxiety disorder and major depressive disorder of fluctuating severity and that some days she struggles to get out of bed or accomplish any tasks. (Tr. 952). Psychiatric signs included feelings of worthlessness, anxiety, anger, mood swings, depression and forgetfulness. (Tr. 953). Dr. Scherbinski indicated that pain prevented her from falling asleep and would wake her; she had excessive sleep during the day; and she would typically take naps for a few hours each day with hypersomnia associated with depression. (Tr. 953-954). Dr. Scherbinski indicated that Plaintiff

did not have coping mechanisms sufficient to allow her to return to full-time employment and that she would become overwhelmed. (Tr. 954). He indicated that she had anxiety about work performance and was easily distracted by anxiety or internal thoughts of depression. (Tr. 955).

The ALJ afforded "little weight" to the medical opinions of Dr. Scherbinski that Plaintiff would miss more than three days of work a month and would be "off-task." (Tr. 20). Notably, the ALJ failed to address Dr. Scherbinski's opinions concerning Plaintiff's hypersomnia associated with depression, difficulty sleeping at night due to pain, and napping during the day. Dr. Scherbinski also opined that Plaintiff' symptoms would likely increase if she returned to full-time employment, yet the ALJ also did not address this aspect of Dr. Scherbinski's opinion. (Tr. 953-954).

The ALJ apparently assigned the opinions concerning absences and "off-task" behavior "little weight" for two reasons. First, the ALJ claimed that the opinions were generally inconsistent with the evidence. Next, the ALJ discounted the opinions because "the record does not contain any documents evidencing [Dr. Scherbinki's] treatment other than a summary at Exhibit 27F." (Tr. 20).

Plaintiff claims that the ALJ has failed to explain and identify in what manner the evidence failed to support or is inconsistent with Dr. Scherbinki's opinions, and points out that the evidence demonstrates significant mental health symptoms, including difficulty getting motivated to get out of bed, avoiding leaving the home, becoming anxious around other people, and feeling down and flat. (Tr. 799-800). In May 2016, Plaintiff was having increased depressive symptoms with crying spells, mood swings, irritability, and difficulty sleeping; she noted a significant increase in her pain levels which she felt may be triggering her depression. (Tr. 809).

Dr. Scherbinski's opinions are consistent with Dr. Corbin's opinion and his treatment records concerning Plaintiff's anxiety and depression, which were exacerbated by her chronic pain. Dr. Corbin prescribed multiple psychiatric medications to treat Plaintiff' anxiety and depression, including adding and then increasing the dosage of Seroquel because symptoms were not well controlled. (Tr. 780, 810).

With respect to the lack of treatment notes, Dr. Scherbinski summarized his treatment, and the ALJ has not identified reasons to doubt the accuracy of the summary. SSA's own policy recognizes the extra protection afforded to psychotherapy notes and indicates that the notes are not needed. *See* Fact Sheet For Mental Health Care Professionals: Supporting Individuals' Social Security Disability Claims, Publication No. 64-103, January 2008. https://www.ssa.gov/ disability/professionals/mentalhealthproffacts.htm ("Social Security recognizes the sensitivity and extra legal protections that concern psychotherapy notes (also called "process" or "session" notes) and does not need the notes."). In addition, SSA Form SSA-827 (Authorization to Disclose Information to the Social Security Administration) accompanying medical records request specifically excludes from the release "psychotherapy notes." *See* POMS DI 1105.055 B.2. Completing Form SSA-827 (Authorization to Disclose Information to the Social Security Administration (SSA)) (permission to release records excludes "psychotherapy notes" as defined in 45 CFR 164.501).

Plaintiff argues that she should not be penalized because her psychologist summarized her treatment rather than providing the psychotherapy notes. SSA's own policy protects disclosure of those records. Moreover, if the ALJ doubted the summary, he should have sought clarification from Dr. Scherbinski or further development of the record by seeking an updated mental status

examination. "An ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable." *Barnett*, 381 F.3d at 669 (collecting cases).

Plaintiff argues that the ALJ impermissibly "played doctor" and substituted his opinion for the well supported opinion of Plaintiff's treating psychologist. This alleged error is harmful, because the ALJ failed to incorporate the well-supported mental limitations indicated by Dr. Scherbinski concerning attendance and off-task behavior in the residual functional capacity assessment and did not properly account for her moderate limitation in concentration, persistence and pace in his residual functional capacity assessment and hypothetical to the vocational expert. (Tr. 15-16). *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010); *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009); *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003).

Plaintiff also argues that the ALJ failed to properly weigh the opinion of Shelli Winther, NP. In November 2016, Plaintiff presented to Shelli Winther at the Parkview Chronic Pain Clinic. (Tr. 912). At that visit, nurse practitioner Winther observed gait difficulty and noted that Plaintiff was in danger of injury with difficulty maneuvering stairs, numbness, stumbling, and multiple falls. (Tr. 912). She ordered a one point adjustable cane at that time. (*Id.*). In July 2017 Plaintiff presented to the Parkview Center on Aging and Health where it was recommended that she use a cane or two canes when tired, hurting, or not confident.(Tr. 1062).

The ALJ failed to address the opinion of nurse practitioner Winther concerning Plaintiff's need for a cane. This recommendation was affirmed by later records from Parkview Center on Health and Aging at a July 2017 visit. (Tr. 1060-1062). Plaintiff contends that the failure to evaluate this opinion evidence regarding the need for a cane is a harmful error. *See* 20 § C.F.R. 404.1527(f). Adjudicators should "explain the weight given to opinions from [non-acceptable

22

medical source] or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." 20 § C.F.R. 404.1527 (f)(2). In this case, Ms. Ringenberg testified that there would be no work for an individual who required an option to sit or stand and a cane for ambulation and standing. (Tr. 199).

The ALJ chose to give "significant weight" to the opinions of the state agency medical consultants, Drs. Corcoran and Brill. (Tr. 20). In March and July 2015, these non-examining physicians projected that Plaintiff would be able to perform a limited range of light work as of December 2015, which was 12 months after she underwent surgery on her right shoulder. (Tr. 225-229, 228-240, 518-519). The ALJ gave significant weight to the state agency physicians' opinions and concluded that the opinions were "largely consistent with the overall record, including claimant's unremarkable findings upon examination." (Tr. 20). In this regard, the ALJ has failed to articulate what findings are "unremarkable." Moreover, despite affording the opinions "significant weight," the ALJ failed to include important limitations opined by Drs. Corcoran and Brill who found that Plaintiff would be limited in reaching not only overhead but also in front and/or laterally on the right. (Tr. 226, 239). Here, the ALJ limited Plaintiff to no overhead reaching bilaterally but did limit her with regard to reaching in front and/or laterally. (Tr. 16).

The state agency opinions were also rendered without the benefit of the complete record and the residual functional capacity was projected, meaning that the physicians anticipated improvement of Plaintiff' functioning by December 2015. (Tr. 225, 238). Rather than improving, the medical evidence demonstrates that Plaintiff' condition deteriorated after the consultants

reviewed her claim. In January 2016, Plaintiff presented for a surgical consultation at the Laser Spine Institute because she was experiencing progressively worsening pain radiating into the shoulders and upper extremities into the hands with numbness, tingling, burning, weakness, and frequent headaches. (Tr. 990-999). Plaintiff underwent surgery on the cervical spine, a right C5-C6 laminectomy and foraminotomy for decompression of the nerve root, after cervical spine imaging from January 2016 showed neuroforaminal narrowing at C5-6 and C6-7 and bulging discs at C5-6 and C6-7 with foraminal stenosis at C5-6. (Tr. 960, 986).

After the cervical spine surgery, Plaintiff began to experience episodes of falling with balance problems and pain in the back of the neck to the right shoulder with numbness and weakness in the hands. (Tr. 663-666, 843-944). She was also evaluated for bilateral knee pain in August 2016, and x-rays showed chrondromalacia of both patellae. (Tr. 829-835). Imaging from September 2016 showed mild bi-compartmental degenerative disease with small knee effusion in both knees. (Tr. 956, 982, 987).

A November 2016, examination showed positive straight-leg raise test in the sitting and supine positions positive for radicular pain on the right greater than the left (Tr. 911-912). She had tenderness and muscle spasms to the bilateral paraspinal muscles, difficulty standing from a seated position with frequent position changes in the chair due to discomfort and difficulty getting onto the exam table due to pain lifting her legs. (*Id.*). She had decreased range of motion with arms above the head, bilateral hand grip weakness, and right lower extremity weakness. (Tr. 912). Gait was antalgic and a cane and lumbar MRI were ordered. (*Id.*).

Results from a December 2016 lumbar MRI spine were positive for a multilevel facet arthropathy with central protrusion at T12-L1 with annular fissure without canal or foraminal

stenosis. (Tr. 932-933). Her diagnoses included chronic pain syndrome, lumbosacral radiculopathy, and lumbar facet arthropathy. (Tr. 933).

In July 2017, Dr. Voorhies with Parkview Physician Group Neurosurgery diagnosed chronic bilateral low back pain without sciatica, intermittent tremor, fibromyalgia, frequent falls, and balance problems and referred Plaintiff to a fall prevention clinic. (Tr. 1054-1056). In July 2017 Plaintiff presented to the Parkview Hospital Center on Aging. (Tr. 1058-1062). She was instructed to use a cane or two canes when tired, hurting, or not confident, and to gaze straight forward when walking. (Tr. 1062).

Plaintiff argues that the ALJ erred in relying on outdated opinions of the agency consultants who projected a residual functional capacity based on an expectation that Plaintiff's condition would improve and in rejecting the updated, well-supported opinions from Plaintiff's treating medical professionals. Here, there was updated evidence "containing new, significant medical diagnoses [that] could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 883 F.3d 722, 728 (7th Cir. 2018); *see also Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014)(reversing where the ALJ uncritically accepted the conclusions of consulting physicians who had not examined the claimant and had not been soon an MRI report which was potentially new and decision evidence.)

Despite the updated evidence, the ALJ failed to include greater limitation in the physical residual functional capacity assessment accounting for the new diagnoses, worsening symptoms, and chronic pain. Instead, the ALJ partially adopted the limitations from an outdated, projected residual functional capacity assessment and also omitted important limitations from the state agency assessment with regard to reaching in front and laterally. Plaintiff concludes that as a

result of the ALJ's multiple errors in evaluating the medical opinion evidence, his residual functional capacity and denial of benefits is not supported by substantial evidence.

In response, Defendant concedes that Drs. Corbin and Scherbinski are acceptable treating medical sources but contends that the ALJ properly found the opinions lacked corroboration in the medical record. Defendant further implies that the ALJ's acknowledgement of a treating relationship suffices as consideration of the "checklist factors" in 20 C.F.R. 404.1527 that an ALJ is required to consider in evaluating treating source opinions.

With respect to Dr. Corbin's opinions, the ALJ claimed that Plaintiff demonstrated a lack of symptoms upon examination and that the diagnostic findings did not support Dr. Corbin's opinions. (Tr. 20). Defendant argues that the ALJ's recitation of medical evidence in connection with Plaintiff's symptom testimony is sufficient for discounting Dr. Corbin's opinions. (Tr. 18). There are three flaws to this argument. First, the ALJ has failed to supply an explanation as to how the evidence undermines Dr. Corbin's opinions. Next, the ALJ was impermissibly selective in choosing the evidence upon which to base his decision. Finally, the ALJ impermissibly substituted his own lay view of the medical evidence, including the significant new medical evidence, for the opinions of Plaintiff's long-time treating physician.

In discussing evidence allegedly undermining Plaintiff's symptom testimony, the ALJ claimed the evidence failed to support allegations of disabling physical impairments. (Tr. 18). The ALJ failed to explain how any of that evidence undermined Dr. Corbin's opinions, particularly with regard to absences and "off task" behavior. It is noteworthy that Dr. Corbin did not rely solely on Plaintiff's physical impairments as the basis for his opinions, but he also cited anxiety, stress, and pain levels. (Tr. 948-949). Neurologist Dr. Curfman also opined that

depression was amplifying Plaintiff's symptoms. (Tr. 587-589).

Next, the evidence cited by the ALJ and identified in by Defendant reflects impermissible "cherry-picking." *Scott v. Astrue*, 647 F. 3d 734, 740 (7th Cir. 2011) ("The ALJ was not permitted to 'cherry-pick' from those mixed results to support a denial of benefits."). The ALJ characterized the objective medical findings as "mild or unremarkable," yet the cervical spine MRI performed after the state agency medical consultant's review demonstrated abnormalities sufficient to warrant a right C5-6 cervical spine surgery. (Tr. 985, 987). Although the records indicate that the surgery went well initially, in March 2016 Plaintiff reported that she had fallen after her surgery and her pain was returning. (Tr. 672). Medical evidence demonstrated abnormalities including, *e.g.*, strength reduced to 4/5, severely limited extension of the lumbar spine, decreased range of motion (ROM) with arms, bilateral hand grip weakness, antalgic gait, positive straight leg raising (SLR) sitting and supine, tenderness and muscle spasm, difficulty standing from a seated position, and antalgic gait. (Tr. 663, 665-666, 911-912). The record also substantiates an increase in Plaintiff's mental symptoms with the progression of her physical impairments, including with anxiety and chronic depression with findings that Plaintiff was tearful, had crying spells, was anxious when discussing pain, and had depressed mood, poor motivation, and poor sleep. (Tr. 437, 441, 603, 779, 789, 800, 810, 897).

The ALJ also impermissibly interpreted the medical evidence as allegedly inconsistent with Dr. Corbin's opinions. Defendant does not dispute that there was a significant amount of important new medical evidence and diagnostic findings added to the record after the state agency medical consultants reviewed Plaintiff's claim. The Seventh Circuit has repeatedly warned against impermissible cherry-picking of the records and against ALJs succumbing to the

temptation to play doctor. *Kaminiski v. Commissioner*, 894 F. 3d 870, 874-75 (7th Cir. 2018). The ALJ's consideration of this updated evidence without the benefit of medical expert review is another factor undermining his decision to discount Dr. Corbin's opinions. This evidence strongly supports Dr. Corbin's medical opinions.

With respect to the "checklist" factors, the Defendant contends that the ALJ's mere mention of a "long treating relationship" was sufficient evaluation of the factors described in 20 C.F.R. 404.1527. First, the acknowledgement that Dr. Corbin was a long-time treating physician does not reflect how or even whether that factor affected the ALJ's weighing of Dr. Corbin's opinion. Next, the Commissioner does not refute Plaintiff's arguments regarding the ALJ's failure to consider other factors under 20 C.F.R. 404.1527 supporting Dr. Corbin's opinions. As Plaintiff identified, Dr. Corbin provided explanations for his opinions which are supported by the record. Because Dr. Corbin treated Plaintiff for both her physical and mental impairments, he accounted for the combined impact of these impairments on her ability to work; he specifically cited her multiple joint pain, anxiety, and stress levels as factors limiting her ability to remain on task and maintain attendance. (Tr. 948-949). The Commissioner also does not dispute that Dr. Corbin supplied the most recent medical opinion taking into account significant new medical findings.

With respect to the opinions of Dr. Scherbinksi, the Commissioner argues that the ALJ properly afforded the opinions little weight. However, the ALJ agreed that Plaintiff's impairments worsened because he rejected the earlier opinions of the state agency psychological consultants who determined that Plaintiff's mental impairments were "non-severe" in April and July 2015. (Tr. 20, 223-224, 236-237). Yet, in considering Plaintiff's mental impairments, the ALJ evaluated the updated mental health treatment and diagnoses himself rather than relying on an expert

opinion. The ALJ substituted his own opinion for that of a treating source psychologist who provided a well-reasoned, good explanation for his opinions and noted interplay between Plaintiff's depression, anxiety, pain, and sleep difficulties limiting her ability to focus on work and maintain attendance. (Tr. 952-956). The ALJ impermissibly interpreted the medical evidence and again substituted his lay opinion for that of a medical expert. *Kaminski*, 894 F.3d at 875, citing *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014); *Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir. 2015) (ALJ's are required to rely on expert opinions instead of determining the significance of medical findings themselves.").

With respect to the psychotherapy notes, the Commissioner has not responded to Plaintiff's argument that it is SSA's policy to exclude the notes. Defendant has also failed to identify an explanation or reason for the ALJ to doubt Dr. Scherbinski's summary. Plaintiff argues that she should not be penalized because her psychologist did not disclose psychotherapy notes which SSA recognizes are entitled to extra legal protection and not necessary.

The Commissioner emphasizes that it is claimant's burden to supply evidence of disability; however, the ALJ also has a duty to develop the record. This duty is not limited - as the Commissioner suggests - to developing a complete medical history for the twelve-month period preceding the month a disability application is filed. An ALJ is required at the hearing to look "fully into the issues" and may "stop the hearing temporarily and continue it at a later date if he or she finds that there is material evidence missing at the hearing." 20 C.F.R. 404.944. SSA regulations also include provisions for ordering consultative examinations where a claimant's medical sources "cannot or will not give [SSA] sufficient medical evidence about [the claimant's] impairment for [SSA] to determine whether [the claimant] is disabled or blind." 20 C.F.R.

404.1512 (b)(2); 20 C.F.R. 404.1517. The duty to fully develop the record is also well recognized

in case law. *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) (collecting cases); *Minnick v.*

*Colvin,* 775 F. 3d 929, 938 (7th Cir. 2015), citing *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir.

2007).

With respect to the opinions of Parkview Center on Aging and Health and nurse

practitioner Winthers, the Commissioner apparently concedes that the ALJ failed to consider the

opinions contained within Exhibit 33F. The Commissioner urges this court to find harmless error

because the ALJ otherwise acknowledged that Plaintiff had received a prescription for a cane.

However, as the Plaintiff points out, the ALJ's general mentioning that Plaintiff had been

prescribed a cane does not assure this court that the ALJ was even aware of the opinions from Ms.

Winthers and Parkview Center on Aging and Health let alone accounted for the opinions,

particularly since he did not include this limitation in the hypothetical to the vocational expert and

assessment of Plaintiff's residual functional capacity. Also, when Plaintiff presented for an

appointment in July 2017, her medical providers at Parkview Center on Aging and Health

recommended that she use one or two canes when tired, hurting, or not confident. (Tr. 1062).

Clearly, the failure to consider the opinion is a harmful error. The ALJ determined that

Plaintiff could perform light work, which by definition requires a significant amount of standing

and walking, *i.e.*, approximately six hours of an eight-hour workday. *See* Social Security Ruling

(SSR) 83-10 (The full range of light work requires standing or walking, off and on, for a total of

approximately 6 hours of an 8-hour workday.). The ALJ also failed to include any limitation in a

residual functional capacity assessment accounting for Plaintiff's need to use a cane, let alone two

canes. (Tr. 16). As Plaintiff notes, the ALJ's failure to consider this evidence was a harmful error

because the recommendation could impact the outcome of the case. Had the ALJ properly considered the opinion and incorporated the need to use one or two canes and Plaintiff's difficulties with ambulation in the residual functional capacity assessment, a finding of disability would be supported based on the testimony of the vocational expert.

With respect to the state agency medical consultant opinions of Drs. Corcoran and Brill, Defendant argues that the ALJ properly weighed those opinions and gave them "significant weight." The Commissioner does not dispute Plaintiff's argument concerning the significant medical evidence received subsequent to the state agency medical opinions. Rather, the Commissioner claims there was no error because the ALJ considered Plaintiff's "entire treatment history." However, the ALJ is not a medical doctor, and his review of the medical evidence is not a substitute for review by a medical expert. Plaintiff has identified a plethora of important medical evidence that was never reviewed by a medical expert.

The Seventh Circuit has cautioned that ALJs should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion. *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018) (citing *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014)); *see also Akin v. Berryhill*, 887 F.3d 314, 317-18 (7th Cir. 2018) (holding that the ALJ's error in interpreting MRI results himself could have been avoided by seeking an updated medical opinion (citing *Goins*, 764 F.3d at 680; *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014); *Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000)). Like in *Moreno* and *Stag*e, Plaintiff's post-July 2015 medical records contain significant, new developments that could have reasonably changed the consultants' opinions and projections regarding Plaintiff's impairments and residual

functional capacity.

In light of all the above, this court finds that remand is required so that the ALJ may properly weigh all the medical opinion evidence and include all of Plaintiff's limitations in the RFC.

Next, Plaintiff argues that the ALJ's step three finding regarding Listing 1.04 is perfunctory and not supported by substantial evidence. A cursory analysis by the ALJ of whether a claimant meets or equals a listing which fails to articulate a rationale for denying benefits when the record supports a finding in claimant's favor is an error. *Minnick v. Colvin*, 775 F.3d 929, 935-36 (7th Cir. 2015); *Kastner v. Astrue*, 697 F.3d 642, 647-48 (7th Cir. 2012); *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003). In the present case, the ALJ devoted two sentences to evaluating whether Plaintiff' impairment satisfied Listing 1.04: "The claimant's various back impairments do not meet or medically equal listing 1.04 (disorders of the spine). There is no evidence of nerve root compression with the required characterizations, spinal arachnoiditis or lumbar spinal stenosis with pseudoclaudication that results in inability to ambulate effectively." (Tr. 14).

Plaintiff argues that the ALJ failed to address important medical evidence suggesting that Plaintiff's impairments met or equaled Listing 1.04. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §1.04. In January 2016, Dr. Francavilla indicated that imaging showed foraminal stenosis on the right side at C5-6. (Tr. 988). A December 2016 MRI showed multilevel facet arthropathy with central disc protrusion at T12-L 1 with annular fissure without canal or foraminal stenosis. (Tr. 1044). A neurological evaluation from March 2015 revealed sensory loss with reduced pinprick and vibration sensation in the median distribution and distal loss of sensation in both feet with

deficits of vibration in the great toes. (Tr. 588). There is also evidence that Plaintiff had reduced strength at 4/5 in the bilateral lower extremities and limitation of range of motion of the spine. (Tr. 663- 665, 708, 996). Beginning in November 2016, examinations also showed positive straight leg raise test in the sitting and supine positions positive for radicular pain on the right greater than the left. (Tr. 911, 932). Dr. Corbin also indicated that Plaintiff could only walk one-half block. (Tr. 947).

Given the above findings along with Plaintiff's increasing difficulties with ambulation and episodes of falling in 2016 and 2017 with the recommendation as of November 2016 that she use a cane, Plaintiff argues that the evidence reasonably suggests that her impairments are at least equivalent in severity to Listing 1.04. Given that much of this evidence was received subsequent to the state agency medical consultant review, there is no assurance that agency sufficiently considered whether Plaintiff's impairment met or equaled Listing 1.04. Rather than soliciting a medical expert opinion on the matter, the ALJ assumed the absence of equivalency without any relevant discussion. That assumption does not support the decision to deny benefits. *Barnett*, 381 F.3d at 671.

In response, the Commissioner argues that the record does not contain the requisite signs, symptoms, or laboratory findings described in impairment Listing 1.04 and as a result the ALJ's findings at step three are supported by substantial evidence. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04. In particular, the Commissioner claims that the state agency reviewed Plaintiff's case through July 2015 and that new evidence and imaging after that time showed only "mild findings that did not meet the requirements of Listing 1.04, including a lack of nerve root compression. As the Plaintiff notes, however, the Commissioner is incorrect. In January 2016, Plaintiff

underwent cervical spine imaging that showed narrowing and stenosis at C5-6; surgery was required to decompress the C5-6 nerve root. (Tr. 986-987).

The Commissioner further argues that there is also a lack of evidence concerning inability to ambulate effectively, but she fails to reconcile this claim with evidence from Parkview Center on Aging and Health that Plaintiff uses one or two canes to ambulate when feeling unsteady, unsafe, or unsure. The Commissioner does not dispute that the ALJ did not evaluate or acknowledge this evidence from Parkview Center on Aging and Health and nurse practitioner Winthers. As Plaintiff has noted, other important examination findings also suggest that Plaintiff's impairments met or equaled Listing 1.04.

Clearly, Plaintiff has produced sufficient evidence that her conditions may be severe enough to meet or equal Listing 1.04. The ALJ's scant analysis does not allow the Court to discern whether he considered and dismissed, or completely failed to consider, this pertinent evidence. *Minnick v. Colvin*, 775 F. 3d 922, 936 (7th Cir. 2015) (finding an ALJ's analysis of Listing 1.04 inadequate where the ALJ failed to acknowledge several aspects of the record that could in fact meet or equal the listing). Moreover, the ALJ also erred because he never sought an expert's opinion as to whether any of the evidence could support a finding of equivalency. *Id.* citing *Barnett*, 381 F.3d at 670-71 (stating ALJ's assumption of absence of equivalency without any relevant discussion and without consulting an expert's opinion could not support the decision to deny benefits). Thus, remand is warranted.

Lastly, Plaintiff argues that the ALJ failed to properly evaluate her symptom testimony. A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence. *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017). With

respect to Plaintiff's testimony concerning her symptoms, the ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to produce the above alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. Accordingly, these statements have been found to affect the claimant's ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence." (Tr. 18).

Plaintiff argues that the ALJ has failed to properly consider and evaluate the factors for considering symptom testimony and that the ALJ has impermissibly "cherry-picked" the evidence and failed to consider the treatment and evidence supporting Plaintiff' symptom testimony. The ALJ stated the diagnostic findings show mild or unremarkable findings in her cervical and lumbar spine, right shoulder and knees. (Tr. 18). Yet this characterization is inconsistent with the fact that Plaintiff' right shoulder and cervical spine impairments were severe enough to require surgery and ongoing pain management treatment. (Tr. 627-637, 661-720, 843-944, 960, 990-999, 1046-1048).

Plaintiff points out that the ALJ also impermissibly interpreted the medical evidence when he concluded that the "objective imaging does not support her allegation of disabling physical impairment." (Tr. 18). Clearly, the ALJ is not independently qualified to opine that the evidence does not support work preclusive abnormalities. *Rohan v. Chater*, 98 F. 3d. 966, 971 (7th Cir. 1996) (reversing and remanding where the ALJ substituted his own judgment for that of the medical witnesses and reached his own determination regarding the degree of the claimant's impairments).

With respect to Plaintiff's mental health symptoms, the ALJ claimed that the record does not corroborate her allegations of disabling depression and anxiety. (Tr. 19). However the ALJ has failed to consider the physical and mental impairments together and, as discussed above, impermissibly rejected the evidence from Dr. Scherbinski. The medical and opinion evidence demonstrate that there is a link between Plaintiff's chronic pain and her depression and anxiety. (Tr. 780, 809-810, 946-948). Plaintiff contends that the testimony and medical opinion evidence reflect that the combination of her mental and physical impairments result in disabling limitations and are consistent with Plaintiff's testimony.

Plaintiff further contends that the ALJ's rationale for discounting the symptom testimony also fails to recognize that even if reports of disabling pain are not fully supported by the objective medical evidence, the ALJ must "investigate all avenues presented that relate to the pain." *Clifford*, 227 F.3d at 871-872, quoting *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994). The ALJ also did not address the fact that Plaintiff's allegations of pain were consistent with the strong prescription pain medication she was taking. *Plessinger v. Berryhill*, 900 F.3d 909, 916 (7th Cir 2018), citing, e.g., *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (finding doctor's prescription for strong pain medications corroborated claimant's credibility regarding pain).

The Seventh Circuit has repeatedly indicated that an ALJ must consider the combined effect of the impairments and "even if each problem assessed separately were less serious than the evidence indicates, the combination of them might well be totally disabling." *Martinez v. Astrue*, 630 F. 3d 693, 697-697 (7th Cir. 2011), citing Matthew J. Bair, et al., "Depression and Pain Comorbidity: A Literature Review," 163 Archives of Internal Med. 2433 (2003); Bruce A.

Arrow et al., "Comorbid Depression, Chronic Pain, and Disability in Primary Care," 68 Psychosomatic Med. 262 (2006). Reading the ALJ's decision as a whole, it appears that the ALJ selected evidence to support his conclusion rather than basing his conclusion upon an objective evaluation of all the evidence. This methodology is not permissible. *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011)(noting that an ALJ may not "cherry-pick" portions of the record while ignoring others to support a denial of benefits).

The ALJ has also failed to identify in what manner Plaintiff's daily living activities are allegedly inconsistent with her disabling impairment. (Tr.19). Moreover, most of the activities cited are from a function reported completed in June 2015. (Tr. 360-367). The evidence indicates Plaintiff' progressively became more limited after that time. Moreover, even in June 2015, the activities Plaintiff reported was still quite limited, including *e.g.*, preparation of only quick meals, limited chores, difficulty remembering to pay bills, needing reminders to take medications, and becoming anxious and upset easily. (Tr. 360-364). While a claimant's ADLs are an appropriate factor for an ALJ to consider, the Seventh Circuit has "repeatedly cautioned that a person's ability to perform daily activities . . . does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir 2013). Similarly, when an ALJ considers a claimant's activities, they should consider not only what the claimant does, but also how the claimant goes about performing those activities and what effect the activities have on the claimant. *Craft v. Astrue* 539 F.3d 668, 680 (7th Cir 2008).

In response, the Commissioner argues that the ALJ considered "multiple factors in the evaluation of Plaintiff's symptoms" and his analysis was "not patently wrong and should be upheld." However, contrary, to the Commissioner's assertion, the ALJ's evaluation of Plaintiff's

symptom testimony is not entitled to deference in this case due to the serious errors in failing to logically connect the reasons for the assessment to the conclusions. *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017).

The position of the Commissioner and the ALJ that Plaintiff improved following surgeries and with medication fails to recognize evidence showing that improvement in physical symptoms was temporary and that her mental symptoms progressively worsened. This is supported by the increase in treatment and necessary medical interventions, including surgery, pain medications and psychotherapy. Further, there is no reasoned explanation as to how Plaintiff's alleged improvement or her activities of daily living undermined her symptom testimony. As Plaintiff notes, the Defendant has not refuted Plaintiff's argument that the ALJ failed to take into account the combined effects of all of her impairments, including the effect of her chronic pain syndrome and her depression and anxiety, in assessing her credibility and formulating the residual functional capacity assessment. Defendant apparently concedes this error in light of her failure to provide a substantive response to this argument. Clearly, remand is appropriate so that the ALJ may properly evaluate Plaintiff's symptom testimony.

## Conclusion

On the basis of the foregoing, the decision of the ALJ is hereby REMANDED for further proceedings consistent with this Opinion.

Entered: April 15, 2019.

s/ William C. Lee
William C. Lee, Judge
United States District Court